The opinion of the court was delivered by
Watkins, J.
This litigation is supplementary to and grows out of a previous opinion of this court, which was rendered in a suit of same title as this, and which is reported in 48 An. 1036; and to which we refer for a complete statement of the issues involved and the conclusions at which we arrived, the chief purpose and object thereof being to determine the scope and meaning of the will of the deceased.
' The following extract from our opinion in that case will illustrate, to a certain extent, the scope of the‘present controversy, namely:
“The succession is in no condition.'for final settlement. . The crop of 1894 has not been disposed of, '.and the" sugar bounty claim is uncollected * * * The judgment appealed from is so amended as to give Mrs. Bettie Allen the net proceeds of the crop on the Rienzi plantation for the year 1804, and 'one-half the plantation; and one-fifth interest in same to each of the families,” etc., enumerating them.
In all other respects the judgment appealed from was affirmed.
But, on the application for rehearing, the court made this explanatory statement, viz.:
“ The applicants have misunderstood our decree. It does not say, nor was it intended to convey the impression, that the funds ready for distribution should be withheld from those entitled to the same under the will. The succession is to be continued in its administration until the payment of the bounty, when it will be distributed according to law. All funds ready for distribution must reach their destination without unnecessary delay.” (Our italics.)
In that condition the cause was remanded to the lower court for further proceedings, and final settlement, in conformity to the views therein expressed.
When the cause went back to the lower court, the executors, W. F. Collins, and Mrs. Bettie Allen, joined in the preparation and *1098 filing of a final account, but Ogden Smith, the third executor, disagreeing with the two first named, with respect to what was the correct interpretation to be placed upon our opinion, filed a separate final account of his own, in which he made a distribution different from that proposed by his associates.
These two final accounts resulted in sundry oppositions, the disposition of which is the subject of the present appeal.
The questions at issue can be most correctly stated, and more understandingly apprehended, by premising our recapitulation of them by a resumé of the District Judge’s views, as they are set forth in his reasons for judgment, and, for that purpose, the following extracts therefrom will suffice, namely:
“ By an agreement of record, the two accounts are to be taken as answers, or oppositions to each other, and the whole matter is to be considered and disposed of in one decree.
“ All the (legal) heirs have filed oppositions to the final account of W. F. Collins and Mrs. Bettie Allen (executors), opposing (their) distribution of the bounty money (to the latter), alleging that it formed no part of the crop of 1894, or of the proceeds thereof, and is unwilled, and (further) seeking to charge her with the portion of the expense of the crop of 1894 incurred prior to the death of (the testator), and also with the deficit of the crop of 1895. ”
He then states that all of the heirs except three concur in the account filed by Executor Ogden Smith, and pray for its homologation, while the three heirs excepted oppose that portion of same in which it is proposed to leave them out entirely in the distribution of the bounty money, alleging themselves to be entitled to an equal distributive share thereof.
Then follows this statement, viz.:
“The only questions before the court are questions of law, and the first one is, does Mrs. Allen get the proceeds of the crop of 1894, after deducting the expenses incurred by the executors, after the death of the testator, in saving the crop; or must the expenses incurred prior to-the death of the testator be also deducted. (Our italics.)
$ * * * * *
“ As a general 'proposition ’ ’ — that the net proceeds are what remains after deducting all the costs of production — says the judge, “ this is-undoubtedly correct; bub the expression of the Supreme Court in reference to the net proceeds of the crop in this case must be taken *1099 in conjunction with the provisions of the will on the subject; and be construed in the light of such provision..!’
He then observes that the account of Ogden Smith, executor, then before the court, made reference to the net proceeds of the crop of 1894, and proposed to distribute same among all the legatees, “ provided said legatees shall reimburse to the estate (the) expenses incurred to make and save said -crop since the death of the testator * * * amounting to nineteen thousand seven hundred and thirty dollars and twenty-six cents;” and then stated that, in passing upon that issue he adopted that view of the matter, and that it was when commenting thereon, that this court used the expression “ net proceeds,” and decreed Mrs. Bettie Allen entitled to same under the terms of the will.
“ But the question (as to) what are the net proceeds,” says the judge, “ beyond what was presented by the pleadings, was not passed upon by the court.
“ The clause of the will under which the court gave the crop of 1894 to Mrs. Allen is in these words, viz.:
“ 1 As I fear property will be very low, I give my executors five years to work for a good price. In the meantime that they are waitiug to sell, the place can be rented or worked so as to pay all taxes and other charges; any over that to go to Mrs. Bettie Allen’s credit.’
“This language is plain and unambiguous. It provides for the future renting or working of the plantation to pay the taxes and charges incurred by the plantation while so rented and worked; and that the surplus of the rental or proceeds of (the) crop were to-be turned over to Mrs. Allen. But it does not provide for or contemplate the payment of the debts contracted by the testator himself prior to his death, whether for making the crop or not. The will speaks for the future and directs what the executors shall do in the management of the plantation, namely: rent or work it so as to raise revenue to pay the taxes and charges while waiting for a better price, and to turn over whatever profits are made in thus renting or working it to Mrs. Allen.”
After an explanatory statement, the judge adds:
“The language of the will too plainly provides for the future to. admit of charging up against the crops, debts contracted and in great bulk paid prior to his death. It is clear to my mind that the- *1100 ■only charges against the crop of 1894 [which are to be deducted from the gross proceeds] are the expenses incurred in saving and preparing the crop for market, fixed in the first tableau of executor Smith * * * at nineteen thousand seven hundred and thirty dollars and twenty-six cents; and such further sum as may have been incurred in selling the property,” amounting to two thousand seven hundred and sixty-six dollars and thirteen cents.
He leaves out of consideration the question of the deduction of State and parish taxes, which the opponents claim should also be deducted from the gross proceeds of the crop of 1894, because, in his opinion, they are covered by the plea of res judicata, same having been proposed for settlement on the first account, to be paid from the general assets and funds of the estate, and the judgment ordering the same to be so paid not having been disturbed by the decree of this court.
The judge then addressed his reasons to the claim of the executors, Collins and Mrs. Allen, to the effect that the deficit of nine hundred and sixteen dollars and nineteen cents on the crop of 1895 should be paid from the unwilled assets of the estate, going to the legal heirs, on the theory that Mrs. Allen never consented that the plantation should be worked and operated for her account in 1895, and then to the contention of the executor, Smith contra, and that of the legal heirs, chat this deficit must be paid out of the crop ■of the previous year, 1894.
With regard to this proposition, the judge says:
“ I think the contention of the latter' is well founded. The (provision of) the will already quoted, contemplated that the place should be rented or worked by the executors, .pending sale, and while waiting for a good price, in order to pay the taxes and other charges on the place, and that the surplus realized at the close of operations should be put to the credit of Mrs. Allen.”
Dismissing the question of “neb proceeds” with these ample remarks, he passed to the consideration of the “ bounty money,” and on that question he says:
“ I am clearly of the opinion that the bounty money forms no part of the crop proper, or the proceeds thereof. Though based on the crop as a means of calculation, and conditioned on the production of the crop by the owner ofjthe plantation under certain rules, it was a pure gratuity from the government.
*1101 “ It does not, therefore, go to Mrs. Allen under the will, but to the heirs as an unwilled portion.”
He then says that the three legal heirs to whom no legacies were made in the will, other than the sum of five hundred dollars each, claim their shares in the bounty money, on the ground that it was a gift from the government, made after the death of the deceased, and, consequently, did not fall into his succession, but passed to the legal heirs of the deceased, directly.
The judge then says:
“ The bounty was given after the death of the deceased, but conditioned on his prior fulfilment of certain prerequisites prescribed by the McKinley bill; but the license was obtained, and the equitable claim in payment of which the allowance of the government was made had been granted prior to the death of the testator. The gift was to the testator, or his estate, and not to his heirs, and, consequently, formed a part of his estate.
■ “ The three opponents named are not entitled to participate in the distribution, having been cut out by the terms of the will; and the bounty money, after deduction made of costs of collecting same, three hundred and twenty-one dollars and seventy cents, and the executor’s commissions therefor, ninety-six dollars and forty-one cents — equal to four hundred and eighteen dollars and eleven cents —must be distributed among the remaining heirs.”
He then makes the following statement as the basis of his judgment, viz.:
“ From gross proceeds o£ crop of 1894 . ' $56,072 58
“Deduct expenses incurred since the death of testator, fixed at. 22,496 39'
“ Leaving balance of.:. $33,576 19
“ Deduct deficit on crop of 1895, as fixed in account of Smith, executor, and established by evidence.J. $748 19
and executor’s commissions. 725 '39— 1,473 58
“ Net proceeds of crops of 1894 and 1895. $32,102 61
“ But she must restore amount already drawn and due to estate by her 3,725 22
“ Balance due Mrs. Allen “ and to be paid her out of proceeds of crop.”... 28,377 39
“ Considering that the said account makes a correct showing of the unwilled cash, and of the payments of the legacies and of the debts under the judgment heretofors rendered, except as to the item of reserved costs, two thousand and seventy-two dollars and forty-three cents, the item of amount due by Mrs. Allen, and the bounty, it. is ordered and decreed that said final account of the executors, Mrs. Allen and W. F. Collins, be and the same is approved and homolo- *1102 ■gated, except in so far as hereinabove amended, and as hereinafter amended as to the items just named.
“ It is further ordered and decreed that as to these items the said account be reformed and recast as follows, to-wit:
•“Amount reserved for costs, as stated in said account. $2,072 43
“Amount recovered from Mrs. Allen. 3,725 22
“Amount recovered from bounty. 11,569 35
“ Total . $17,367 00
“ Deduct tliex-efrom costs attending collection of bounty. $321 10
■“Executor’s commissions. 96 41
“ Reserved for future costs.. 300 00— 748 81
“ Balance. $16,618 19 ”
Then follows the distribution amongst the heirs, which it will be unnecessary to detail.
From this judgment the following parties appealed, viz.: The Smith heirs and the executors, Mrs. Allen and W. F. Oollins.
In this court appear Mrs. Jennie Boyle, Bettie De Berry and Allen Baker, as appellees, and make answer to the appeal of the executors, and aver that the funds received by them from the government of the United States under act of Congress in the latter part of March, 1895, was not due to R. H. Allen, nor to his estate at his death, and forms no part of the assets of said estate, nor of the residuum thereof.
That the said R. H. Allen, at the date of making his will, and at the date of his death, had no claim against the government which he could have enforced, or could have been enforced by his executors, subsequently.
That the distribution of said funds is not governed by the provisions of the will of the deceased, but descends directly to the opponents as heirs, and is simply held in trust by the executors.
“That the clause in the will of said deceased, which has been heretofore construed as excluding opponents from participation in the unwilled property of the testator, has not concluded them beyond the residuum of the estate such as it was at the date of the death of said testator; that their capacity of heirship and their right to demand and receive from gratuities created by the government under special laws enacted after the death of the testator has not been destroyed.”
Therefore they prayed that the judgment appealed from be so amended as to maintain their opposition to the final account of the •executors.
*1103 The administrator of the succession of Thos. H. Allen as appellee filed an answer to the appeal of the executors, Mrs. Allen and W. F. Oollins, and prayed for an amendment of the judgment appealed from, “so as to deduct from the gross proceeds of the Crop of 1894 all the expenses of making the said crop, including those preceding the death of the testator,” as well as those which were incurred by the executors in its administration and management, after his death.
The opponents, J. B. Turner and W. A. Turner, also appear as appellees, and make the following answer to the appeal of the executors, viz.:
That the judgment appealed from should be affirmed to the extent that it distributes the bounty money*equally between the three sets of heirs at law, excluding those from participation therein who were excluded by the express terms of thejvill. .
That said judgment is also correct in so far as it distributed among the three sets of heirs at law not e-xcludecj by the will the amount reserved by the executors in prior settlement, the amount of payments made to heirs on account, and;; the further sum found due by Mrs. Allen for moneys drawn in advance.
But, they aver, that in other respects the said judgment is erroneous, and should be modified and amended and made to conform to final account of the co- executor, Ogden Smith.
That said judgment is particularly - erroneous in not having ordered to be returned to the residimm of the estate the sum of four thousand four hundred and seven dollars and seventy-nine cents paid by the executors in making the crop of 1894 after the death of Richard H. Allen, from the general mass of the estate, and from the unwilled cash which belonged to the heirs at law at the date of his death * * * and out of the crop of 1894.
Also, that said judgment is erroneous in the further particular that it- failed to order returned to the general mass of the estate all expenses incurred in 1894 to make the crop of that year, and particularly the sum of twenty-two thousand- eight hundred and thirty dollars paid and expended by the testator, during his lifetime.
Also, that it is erroneous in having sustained the plea of res adqu-dicata; and in some other minor particulars.
From the foregoing synopsis of the reasons for judgment, and of the pleas of opponent, we take the questions for our decision to be the following, viz.: *
*1104 1. Whether the account of Mrs. Allen and W. F. Collins, executors, awarding Mrs. Bettie Allen the net proceeds of the crop of 1894, less the expenses of its cultivation and manufacture which were incurred by the executors subsequent to the death of the testator, should be approved; or should the theory of the opponents that she be only allowed the net proceeds thereof, after deducting all expenses incurred during the entire year, be maintained?
2. Whether the aforesaid account awarding the “ bounty money ” to Mrs. Bettie Allen, as special legatee under the will, on the theory that it formed a part of the net proceeds of the crop of 1894 on the Rienzi plantation, should be approved ; or should the theory of the opponents, to the effect that same formed no part of the crop, nor of the proceeds thereof, but, on the contrary, constituted an unwilled asset of the testator, which at his death passed directly to them as the legal heirs of the residuum of his estate, should be maintained?
■ 8. Whether the contention of the three nieces who were disinherited by the will, to the effect that they are entitled to a share in the “bounty money,” on the ground that it was a gift from the government made after the testator’s death, and, consequently, did not fall into his succession nor constitute a part of the residuum thereof, but descended to the legal heirs directly, should obtain: or, is the contention of the legal heirs — if the bounty money be decided not to go to Mrs. Bettie Allen as special legatee — that said nieces are cut off by the terms of the will and entitled to no share therein, correct, and should it prevail?
4. Whether the said account proposing that the deficit of seven hundred and forty-eight dollars and nineteen cents on account of the crop of 1895, which was made and gathered under the superintendence of the executors, should be paid from the unwilled assets of the estate going to the legal heirs, on the theory that Mrs. Allen never consented that the plantation should be cultivated for her account, should be approved, or should it, as the legal heirs contend, be paid from the proceeds of the crop of 1894, going to Mrs. Bettie Allen as special legatee?
5. Whether the amount claimed in reimbursement of taxes paid on real estate of the testator are covered by the former account and concluded by the plea of res adjudieata filed by Mrs. Allen and W. F. Collins, executors; or is same open for examination and judgment on the final account before us?
*1105 In addition to the foregoing the attorneys of Mrs. Bettie Allen,, special legatee, object to the charge of seven hundred and twenty-five dollars and thirty-nine cents, amount of the commissions of W. F. Oollins, executor, being deducted from the net proceeds of the crop, of 1894, insisting that the same is a charge against the legal heirs, and not against her as legatee:
We will take these propositions without regard to the order they were taken in the argument or presented in the foregoing rgsumé.
I.
What is the true meaning and import of the phrase employed in our opinion, “ the net proceeds of the'crop?'”
In our opinion in the former case »simply said:
“ The judgment appealed from is so amended as to give Mrs. Bettie Allen the net proceeds of the crop of 1894,” etc.; but the clause of the will which superinduced' -that interpretation was the following, viz.:
“As I fear property will be very low I give my executors five years to work for a good price. In '.the meantime that they are waiting to sell, the place can be rented or worked so as'to pay all taxes and other charges; any over that to go to Mrs. Bettie Allen’s credit.”
As the judge a quo observed, this language evidently pointed to and provided for the future, and it had.no effect until the testator’s death. When the will was made.the time of the testator’s death was unknown; consequently no time when it would go into effect could have been fixed or contemplated. Hence, the testator gave general directions to the executors of his will as to the manner in which they should conduct and manage the-'estate when it should come under their control after his death. In view of the fact that the price of property was ruling low at the time he made his will he gave them a period of five years within which to make sale of his plantation; and, further providing for the contingency of delay in effecting a sale, he authorized them to either rent or work same so as to pay all taxes and charges. And in this connection the testator declared that “ any over that (should) go to- Mrs. Bettie Allen’s credit:”
To our minds the conclusion is clear that the will contemplated and dealt with the renting or cultivation of the -plantation after the *1106 •death of the testator, and during such a period of time as it might remain under the administration of the executors pending sale. That as a necessary consequence the taxes and other charges to which the testator referred were those to be incurred during their incumbency; and it is therefore obvious that it was the resulting balance, after their deduction, that the testator desired his surviving widow should have.
He contemplated that those planting operations might continue for five years; and should that have been the case she would have been ■entitled to the resulting balance of each year’s operations. But the date at which the expenses were to begin was evidently that at which the administration of the executors commenced; and only those incurred during their administration should be deducted from the proceeds of the crops in order to ascertain the net balance thereof, including the expense of making the sale.
It is to the terms and conditions of the testament that our previous opinion relates, when it mentions the net proceeds of the crop of 1894; and not to the net proceeds of a crop, taken in the ordinary acceptation of the term.
Had the testator intended that the expenses he had incurred, during his lifetime, should be deducted or accounted for, as debts and ■expenses of the crop, he would have doubtless made some definite statement in his will to that effect. But he did not do so.
Our conclusion is, that in this respect the account of the executors, W. E. Oollins and Mrs. Allen, is correct.
II.
The foregoing argument, in our opinion, disposes of the question of the deficit on account of the crop of 1895, as it was cultivated and manufactured under che superintendence of the executors; and it necessarily followed the destination of the same provision of the will as the proceeds of the crop of 1894.
As the crops grown on the plantation pending the sale were, by the mandate of the will, to 'be turned over to Mrs. Allen, as a particular legatee, after all expenses were paid, the legal heirs must be relieved of the burdens it has occasioned.
■It follows, necessarily, that this deficit is not a charge against the ■unwilled portion of the testator’s estate; and for the same reason it is not a charge against the general estate.
In this respect, our conclusion is, that the account is erroneous.
*1107 m.
The claim for bounty had not been collected when the succession was last before us. Tt was a gratuity from the government, notwithstanding it was based upon an estimate of the crop, as a means of calculation, and predicated upon the'production of a crop by the ■owner thereof, under rules and regulations which were established by the treasury department.
The allowance of the bounty was, by the government, conditioned on the fulfilment by the deceased of certain prerequisites, though payment of it was not made until after his death, and subsequent to the filing of the executors’ provisional account.
The equitable claim of the deceased to the bounty had been created during his lifetime, and the license obtained, and all conditions precedent had been complied with-; though no mention of it was made in the will.
It seems quite clear to our minds that the bounty money which was collected from the government by the executors formed no part of the crops of 1894 and 1895, nor of their proceeds. It was not in esse at the time those crops were grown and gathered.
The executors did nothing but make the necessary proofs preparatory to its collection and receive payment of the money. It must, consequently, be classed as an unwilled asset of the deceased, and not as part of the net proceeds of .the crop of 1894, passing, under the will, to Mrs. Bettie Allen.
The legal principle involved is res nova in a great measure, and ■but few authorities applicable thereto are available.
In Delogny vs. Creditors, 48 An. 488, there was a somewhat similar question discussed and decided. In that case the judge a quo had ordered that the bounty money should be applied to the credit -of a mortgage the insolvent had given to his commission merchants, and of this part of his decree we said:
“ As relates to the pledge the facts are that the mortgagor bound ■himself to pay the bounty of the government to the creditor immediately after the receipt of the amount, just as if the bounty had been a portion of the proceeds of the plantation * * *
“ The bounty was not delivered at the time the attempt was made to pledge it as an additional security for the debt. It was collected from the government by the syndic some time after the act of mortgage had been executed. It is hardly necessary to cite authority in *1108 support of the proposition that delivery is an essential to secure a pledge * * *
“ The bounty was not a portion of the proceeds of the crop; it was no part of the crop.
“We know of no principle of interpretation under which it is-possible to hold that the bounty was delivered as required, and came within the provisions of the statute relative to pledge as a security.’’
Taking that case as an illustration it necessarily results from the argument that the bounty did not, in the instant case, constitute a part of the crop. As it did not constitute a part of the crop of Delogny, possession of which passed to his mortgagee as a pledge; so in the instant case the bounty did not constitute a portion of the surplus of the proceeds of the crops of 1894 and 1895, over and above their expenses, which passed by the will to Mrs. Allen; or, in the language of the District Judge, “it does not go to Mrs-Allen under the will, but to the heirs as an unwilled portion.”
The history of congressional legislation on the question of revenue and bounty on sugar confirms us in the correctness of this conclusion.
By the act of October 1, 1890, known as the tariff act, it was declared that, from and after the 1st of July, 1891, and until the 1st of July, 1905, there shall be paid ‘ ‘ to the producer of sugar * ,* * a bounty of two cents per pound * * * under such rules and regulations as * * * the Secretary of the Treasury shall prescribe.”
The condition prescribed was that “ the producer of said sugar, to be entitled to said bounty, shall have first filed prior to the first of each year, with the Oommissioner of Internal Revenue, a notice of the place of production . * * * with an estimate of the amount of sugar proposed to be produced in the current or next ensuing year * * * and an application for a license to so produce, to be accompanied by a bond in a penalty, and with sureties, to be approved * * * conditioned that he will faithfully observe all rules and regulations that shall be prescribed for such manufacture and production of sugar.”
The act further provided that “the Commissioner of Internal Revenue, upon receiving the application and bond hereinbefore provided for, shall issue to the applicant a license to produce sugar,’” but for a period of one year only.
*1109 And further, that for the payment of the bounty “ the Secretary •of the Treasury is authorized to draw warrants on the Treasurer of the United States for such sums as shall be necessary,” etc.
On the 15th of August, 1894, another act of Congress was received by the President, and, in default of his approval, became a law on the 29th of the month; the purpose and effect of which was to repeal the previous bounty provisions of the revenue law, and make it “ unlawful to issue any license to produce sugar, or to pay any bounty for the production of sugar of any kind under said act.”
In this condition the question remained until the Congress passed ■another act, bearing date March 2,1895, making appropriations for sundry civil expenses of the government for the fiscal year 1896, which, amongst other things, provided “ that there shall be paid by the Secretary of the Treasury to those producers and manufacturers of sugar * * * who complied with the provisions of the bounty law * * * a, bounty of two cents a pound on all sugars * * * manufactured and produced by them previous to the 28th of August, 1894, and upon which no bounty has been previously paid,” etc.
That act further provided that “ the bounty herein authorized to be paid shall be paid upon the presentation of such proofs of manufacture and production as shall be required in each case by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, and under such rules and regulations as shall be pre - scribed,” etc.
From the foregoing extracts from the laws of Congress on the subject, it appears that a bounty on sugar was first granted to take effect on the 1st of July, 1891, and that the law remained in force until the 28th of August, 1894, when it was unconditionaliy repealed and ceased to have any effect.
In the month of September, 1894, the testator died; consequently, when his testament was probated and went into effect by the qualification of the executors therein appointed, whatever claim the testator had prevously, to the bounty, had been completely annihilated by the repeal of the bounty law, and no right or claim thereto passed to Mrs. Allen as special legatee and beneficiary of the “net proceeds ■of the crop of 1894.”
And when in March, 1895, the second bounty act was passed, which gave to “ those producers and manufacturers of sugar who had complied with the provisions of the first bounty law, a bounty of *1110 two cents a pound on all sugars manufactured and produced by them previous to the 28th of August, 1894,” the crop of 1894 had been gathered and sold.
On this statement it seems evident that the avails of the bounty received a destination specially indicated in the act of Congress ; that is to say to those persons who had complied fully with the provisions of the former bounty law; and who had produced and manufactured the sugar previous to the repeal of that law, on the 28th of August, 1894.
When the executors took charge of the estate, the bounty law was repealed; and all they did subsequently was to comply with the rules and regulations specified in the latter act, and collect the money conformably thereto.
When collected it passed into their possession and custody, as an unwilled asset of the deceased, and must pass to the account of the legal heirs; this, of coarse, results in charging to the general estate all the expenses that were incident to the collection of the bounty claim in 1895, as well as those which were engendered in 1894, preparatory to its collection, prior to the passage of the repealing statute.
We understand this to be the purport of our opinion in Webre vs. Beltran, 47 An. 202, and of the United States Court of Appeals in Calder vs. Henderson, 2 U. S. Appeals, 627. In the former case the government issued a license to Beltran as a creditor and that entitled him subsequently to collect the bounty.
As explanatory of the position of the government in respect to bounty, vide United States vs. Realty Company, 163 U. S. 427.
In this respect we are of opinion that the account of the executors, W. F. Collins and Mrs. Allen, is erroneous.
IV.
Whether the three nieces who were excluded from participating in the residuum,, or unwilled portion of the estate of their ancestor, should participate in that portion of it represented by the sugar bounty, depends solely upon the response we make to the proposition which is stated by their counsel in his answer to the appeal, viz.: That the bounty money was a gift from the government, that was made after the testator's death, and for that reason it did not pass into his succession, nor constitute a part of the residuum there *1111 of; but, on the contrary, descended to the legal heirs of the deceased directly.
We are not aware of any such an intermediate stage of inheritance as counsel’s theory supposes.
The law declares that “ the succession * * * becomes open by death.” R. O. C. 934.
That “ a succession is acquired by the legal heir * * * immediately after the death of the deceased person to whom he succeeds.” R. O. O. 940.
That “ the succession not only includes the rights and obligations of the deceased, as they exist at the time of. his death, but all that has accrued thereto since the opening of the succession,” etc. R. O. 0. 873.
From tbe foregoing provisions it is clear, that all the unwilled assets of the deceased, including the bounty money, fell into the' succession, or general estate, whether same were in esse at the time of the ancestor’s death, or arose into existence subsequently, and constituted the residuum, from participation in which the three disinterested legal heirs are precluded.
In this respect we think the account of the executors, W. F. Oollins and Mrs. Allen, is, also, erroneous — it having attributed the bounty money to Mrs. Bettie Allen, and this controversy being an ingredient thereof.
V.
We think it clear, that the disputation about taxes is cut off by the plea of res judicata tendered by the executors, W. F. Oollins and Mrs. Allen, same having figured on the provisional account previously filed and homologated; and which passed under review in the former decision of this court.
That was not only an account but a partial tableau of distribution,, and the item of taxes now agitated was thereon placed, allowed and paid in pursuance of the judgment of the court.
Such a judgment is final, and conclusive against heirs, legatees, and creditors; and operates the bar of res adjudicata.
Succession of Conrad, 45 An. 89.
YI.
We note the contention of the executors, W. F. Oollins and Mrs. Allen, to the effect that commissions of the executors have been erroneously taken into the calculation of the judge a quo as part of *1112 the expenses of the crops of 1894 and 1895, and deducted therefrom in finding the net proceeds thereof. They contend, that the executors’ commissions constitute a charge against the general estate of the deceased t,o be ascertained upon the face of the inventory; and that same can not be legally charged against the allowance going to legatees. In other words, that legatees must be paid in full.
Recurring to the statement we have already quoted from the reasons •of the judge a quo for judgment, we find amongst the charges that he deducted from “the gross proceeds of the crop of 1894” the “executors’ commissions, seven hundred and twenty-five dollars and thirty-nine cents.” That item must refer to executors’ commissions ■on the general estate, because their commissions for the collection of the bounty money were fixed at ninety-six dollars and forty-one cents, and deducted therefrom separately.
The claim of counsel for the executors appears to be well founded in this respect; and the account should be so altered as to conform thereto.
VII.
We have dealt with the account of the executors, W. P. Collins and Mrs. Allen, as it appeared to furnish the better foundation on which to formulate an opinion than that of Executor Ogden Smith— •the latter being practically the foundation of the claim of the legal heirs.
A careful consideration of the case in all its bearings has satisfied •our minds that the judge a quo gave it his careful consideration and reached a correct solution of the controversy in all particulars, except that appertaining to the executors’ commissions.
In that respect the decree should be amended.
It is therefore ordered and decreed that the judgment appealed from be so amended as to tax the general estate with executors’ ■commissions in the amount of seven hundred and twenty-five dollars and thirty-nine cents, and to place a corresponding sum to the credit of the net proceeds of the crop of 1894 which are attributable to Mrs. Bettie Allen as special legatee; and that, as thus amended, the same be affirmed — all costs to be taxed against the general estate.